

MSM/EPS: USAO 2025R00394

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. 25-CR-218 LKG |
| | * | |
| YOLANDA M. JONES, | * | (Conspiracy to Commit Bribery of a |
| | * | Public Official and Commit Honest |
| Defendant | * | Services Wire Fraud, 18 U.S.C. §§ 371, |
| | * | 201(b)(1), 201(b)(2), 1343, and 1346; |
| | * | Forfeiture, 18 U.S.C. § 981(a)(1)(C), |
| | * | 21 U.S.C. § 853(p), 28 U.S.C. § 2461(c)) |
| | * | |

*******

## INFORMATION

The United States Attorney for the District of Maryland and the Acting Chief of the Public Integrity Section, Criminal Division, United States Department of Justice charge that:

### GENERAL ALLEGATIONS

I.  **Background**

1.  The United States Bureau of the Census ("Census Bureau") was a bureau in the United States Department of Commerce and was headquartered in Suitland Maryland.

2.  PERSON A was employed by the Census Bureau from in or about December 2015 to in or about June 2023. By in or about May 24, 2020, PERSON A was serving as the Assistant Division Chief for Enterprise Resources, Administrative Customer Service Division, Chief Administrative Office. PERSON A was responsible for, among other things, overseeing and supervising services for the Census Bureau's Employee Assistance Program ("EAP").

3. While employed by the Census Bureau, PERSON A owned and operated several businesses, including COMPANY A, a mental health company that PERSON A formed in the State of Maryland on or about September 9, 2014.

4. Company B was a limited liability company formed in the State of Maryland on or about January 30, 2009. Company B was owned by Person B and headquartered in Oxon Hill, Maryland. Among other things, it provided data management services to federal and state clients, including the Census Bureau.

5. The defendant, **YOLANDA M. JONES** ("**JONES**"), was associated with PERSON A. On or about February 28, 2020, **JONES** formed YMJ Counseling & Consulting, LLC ("YMJ") in the State of Maryland.

6. PERSON C was employed by the Census Bureau as an EAP Counselor from in or about September 2016 to in or about March 2024. PERSON C was associated with **JONES** and PERSON A.

7. PERSON D was employed by the Census Bureau as a Program Analyst from in or about August 2020 to in or about August 2023. PERSON D was associated with **JONES** and PERSON A.

8. PERSON E was associated with **JONES** and PERSON A. PERSON E owned a company that was formed in the State of Florida on or about February 21, 2022.

II. **The Census Bureau's EAP Contract**

9. On or about May 28, 2020, the Census Bureau awarded a one-year, sole-sourced contract to Company B that totaled approximately $2,860,000. Although the contract initially focused on Company B's digitization services, it was modified on or about July 9, 2020, to add

2

approximately $1,089,000 and include more funds for EAP services (hereinafter the "EAP contract"). The EAP contract was renewed as a two-year contract on or about May 28, 2021. On or about July 2, 2021, the EAP contract was modified to increase the overall amount to approximately $4,425,690.09.

10. YMJ served as a subcontractor on the EAP contract awarded to Company B, and PERSON A steered the procurement process to ensure that Company B retained **JONES** and YMJ as a subcontractor.

11. Between in or about August 2020 and in or about July 2023, YMJ received approximately $2,594,400 in contract proceeds while serving as Company B's subcontractor on the EAP contract with the Census Bureau. Of this amount, **JONES** and YMJ transferred approximately $790,000 to PERSON A and COMPANY A for the enrichment of PERSON A. **JONES** also used a portion of the contract proceeds to pay others, including approximately $41,812 for PERSON C; approximately $20,000 for PERSON D; approximately $20,199 for PERSON E; and approximately $4,560 for PERSON E's company.

## COUNT ONE
### (Conspiracy)

12. The allegations set forth in paragraphs 1-11 are realleged and incorporated by reference as though fully set forth herein.

13. Beginning in or about January 2020, and continuing until in or about July 2023, in the District of Maryland and elsewhere, the defendant,

**YOLANDA M. JONES**,

along with PERSON A and others known and unknown, did knowingly and willfully combine, conspire, confederate, and agree together and with each other:

3

      a.    To engage in bribery, that is, to directly and indirectly, corruptly give, offer, and promise anything of value to a public official and to any other person and entity, with intent to influence an official act and with intent to influence such public official to commit and aid in committing, and collude in, and allow, any fraud, and make opportunity for the commission of any fraud, on the United States, in violation of 18 U.S.C. § 201(b)(1)(A) and (B).

      b.    To engage in bribery, that is, to directly and indirectly, corruptly demand, seek, receive, accept, and agree to receive and accept anything of value personally and for any other person and entity in return for being influenced in the performance of any official act and being influenced to commit and aid in committing, and collude in, and allow, any fraud, and make opportunity for the commission of any fraud, on the United States, in violation of 18 U.S.C. § 201(b)(2)(A) and (B).

      c.    To devise and intend to devise and participate in a scheme and artifice to defraud and deprive the Census Bureau and the citizens of the United States of their intangible right to the honest services of PERSON A, a high-level Census Bureau employee, through bribery and kickbacks; the scheme or artifice to defraud involved a material misrepresentation, false statement, false pretense, or concealment of fact; the Defendant devised and participated in the scheme knowingly and with the specific intent to defraud; and, in advancing, furthering, and carrying out the scheme to defraud, the Defendant transmitted, and caused to be transmitted, any writing, signal, or sound by means of a wire communication in interstate or foreign commerce, in violation of 18 U.S.C. §§ 1343 and 1346.

### Manner and Means of the Conspiracy

The conspiracy was carried out through the following manner and means, among others:

4

14. **JONES**, PERSON A, and others agreed to engage in a corrupt and fraudulent scheme in which PERSON A steered the procurement process for the Census Bureau's EAP contract to ensure that (a) Company B, the prime contractor, would retain YMJ as a subcontractor; (b) the EAP contract would be renewed and modified in a manner that benefitted YMJ; (c) in exchange, **JONES** and YMJ would use a large portion of the EAP contract proceeds to make a stream of payments to PERSON A, COMPANY A, **JONES**, and others associated with **JONES** and PERSON A; and (d) **JONES**, PERSON A, and others would conceal the corrupt and fraudulent scheme from the Census Bureau and others.

15. In exchange for these payments, PERSON A was placed on retainer and agreed to perform, and did perform, official acts—and advised other officials, knowing and intending such advice to form the basis for official acts—on an as-needed basis for YMJ and **JONES** as opportunities arose. PERSON A's official acts, and PERSON A's efforts to influence other officials, benefited **JONES**, PERSON A, PERSON C, PERSON D, and PERSON E, and their respective companies regarding the awarding, modifying, administering, and supervising of the Census Bureau's EAP contract awarded to the prime contractor, Company B.

## Purpose of the Conspiracy

16. The purpose of the conspiracy was: (a) to use PERSON A's official position with the Census Bureau to benefit and enrich **JONES**, PERSON A, YMJ, COMPANY A, and others through a bribery and kickback scheme; (b) to defraud the Census Bureau and citizens of the United States and deprive them of their intangible right to the honest services of PERSON A, a supervisory-level Census Bureau employee, through bribery and kickbacks; and (c) to conceal the nature and purpose of the scheme.

5

### Overt Acts

In furtherance of the conspiracy and to effect its objects, **JONES**, PERSON A, and others committed the following overt acts, among others, in the District of Maryland and elsewhere:

17. Between in or about January 2020 and in or about early February 2020, PERSON A met with Person B and others from Company B and informed them that: (a) PERSON A's division in the Census Bureau needed help digitizing records and providing EAP services; and (b) PERSON A was seeking a company to serve as a prime contractor and contracting vehicle for the EAP contract.

18. On or about February 11, 2020, PERSON A provided Company B with a list of four businesses that provided counseling services, including YMJ, for subcontracting services on the EAP contract. Even though YMJ, at the time, had not yet been formed and incorporated and had performed no prior work with the Census Bureau, PERSON A told Company B that the Census Bureau had previously worked with YMJ and another company and liked their performance.

19. On or about February 15, 2020, after a Company B representative had contacted **JONES** and requested information about YMJ, **JONES** sent an email to PERSON A's personal email account, attaching a "Bio presentation" and stating, "This is what I have so far…." PERSON A forwarded the document between personal email accounts the next day.

20. On or about February 17, 2020, **JONES** created a business-related email account associated with YMJ.

21. On or about February 18, 2020, **JONES** sent a reply email to Company B's representative, attaching a "Bio presentation."

6

22. On or about February 27, 2020, after receiving an email from Company B concerning YMJ's capabilities, **JONES** forwarded the email to PERSON A's personal email account, asking PERSON A to call **JONES** to answer a question. **JONES** then sent a follow-up email to PERSON A's personal email account, attaching draft responses to Company B's questions.

23. On or about February 27, 2020, PERSON A sent an email to **JONES** with an attached document entitled "addendum," which provided responses to Company B's questions. Because YMJ had no past performance or prior contracts with the Census Bureau, PERSON A reminded **JONES** that she did a prior presentation to a group of federal government employees that included a Census Bureau employee.

24. On or about February 28, 2020, **JONES** incorporated YMJ.

25. On or about March 1, 2020, **JONES** sent an email to PERSON A's personal email account with fee rates for YMJ's services.

26. On or about March 4, 2020, PERSON A, using a government email account, informed Census Bureau officials that another $720,000 could be added to the purchase request so that it could include EAP services. PERSON A expressed urgency, stating in part: "Let me know when this will be awarded. We have significant tasks to get underway." PERSON A then forwarded the email to Person B and another representative at Company B asking for a "huddle." Soon thereafter, Company B prepared a proposal for EAP services for PERSON A and the Census Bureau.

27. On or about April 5, 2020, PERSON A, using a government email account, sent a message to the contracting officer for the EAP contract: "Checking in. How are we looking

7

with getting this done?  Let me know how we can help.  Leadership pressure is mounting to get this awarded.  Promises have been made to [the Department of Commerce]." PERSON A and the contracting officer then discussed PERSON A's preparation of several key procurement documents for the EAP contract, including a market research report, an Independent Government Cost Estimate ("ICGE"), the Request for Proposal ("RFP") Solicitation, and a Performance Work Statement ("PWS"), outlining the objectives of the EAP contract.

28. On or about April 8, 2020, after **JONES** conferred with a Company B representative, **JONES** sent an email to PERSON A's personal email account with a sample bid proposal from another vendor and a recap of **JONES**'s discussion with Company B.

29. On or about April 11, 2020, **JONES** sent an email to PERSON A's personal email account with a subject line "Rate Sheet" and a document attached titled "EAP.docx."

30. On or about April 11, 2020, PERSON A, using a personal email account, sent a reply email to **JONES**, attaching YMJ's pricing proposal.  **JONES** replied, "Awesome...we'll talk 6 ish [sic] tonight."

31. On or about April 11, 2020, PERSON A, using a personal email account, sent an email to **JONES** regarding YMJ's proposal.  PERSON A stated, "Okay, Here is what I came up with.  It does not include the changes we talked about.  But this should be everything and more that [Company B representative] wants.  It also gives you a professional look.  You can use this over and over again.  You still need a cover page and table of contents[.]"

32. On or about April 11, 2020, **JONES** sent a reply email to PERSON A's personal email account, thanking PERSON A for the revisions to YMJ's proposal and asking to meet the next day.  PERSON A replied, "Ok, Go through it a few times.  Make sure you understand it and

it speaks to your business. See if [PERSON D] can help with the alignment and cover page that is not my strong point. But you want it neat and professional. Tomorrow is fine just let me know when." **JONES** replied, "Okay." The next day, **JONES** sent the proposal by email to PERSON D. **JONES** then sent an email to Company B, attaching the pricing proposal.

33. On or about April 14, 2020, **JONES** sent an email to PERSON A's personal email account, cutting and pasting a portion of an email from a Company B representative regarding YMJ's pricing proposal.

34. On or about April 23, 2020, **JONES** sent a reply email to Company B with an attachment titled "Topics.docx." The attachment included the topics that PERSON A previously sent to **JONES**. After Company B's representative sent a reply email, **JONES** forwarded it to PERSON A, stating: "Hey, I am getting tired of this chick. Here is her latest ask. . . ." Later that evening, PERSON A replied to **JONES** with a proposed response to Company B.

35. On or about April 28, 2020, PERSON A met with Company B to discuss the EAP contract, including timelines and action items. Company B sent an email to PERSON A's government email account with an after-action summary of the meeting on or about April 30, 2020.

36. On or about April 28, 2020, PERSON A held an "EAP Plan of Action Meeting" with Person B and others from Company B. To prepare for the meeting, Company B prepared a slide deck outlining the proposal. The slide deck indicated that Company B had interviewed 14 EAP vendors and the two finalists included YMJ.

37. On or about May 5, 2020, after receiving an email from Company B on a government email account, PERSON A, using a personal email account, provided the

9

information to **JONES** and included a schedule of topics proposed by Company B. **JONES** replied, "Ok I just spoke to [Company B representative]. Let's talk tonight." PERSON A responded, "Call me[.]" A few hours later, **JONES** replied by attaching a fee rate sheet.

38. On or about May 5, 2020, **JONES** sent an email to Company B, attaching the fee rate document.

39. Between on or about May 6, 2020, and May 11, 2020, PERSON A, using a personal email account, **JONES**, and PERSON C, using a personal email account, sent emails to each other discussing and attaching draft PowerPoint presentations for **JONES** and YMJ.

40. On or about June 4, 2020, after Company B decided to use **JONES** and YMJ as a subcontractor, PERSON A, PERSON C, and other Census Bureau employees held an EAP kickoff meeting with Company B.

41. On or about June 12, 2020, **JONES**, on behalf of YMJ, signed a subcontract with Company B and returned it to Company B on or about June 16, 2020.

42. On or about June 12, 2020, **JONES** sent an email to PERSON A's personal email account, attaching a draft independent contractor agreement. **JONES** sent a follow-up email to PERSON A's personal email account on or about June 17, 2020.

43. On or about June 18, 2020, **JONES** sent an email to PERSON A's personal email account, attaching a draft reply to Company B about concerns related to the EAP response model and contract proceeds. PERSON A replied, "Please DO NOT SEND THIS. Use this instead." PERSON A's proposed email included a revised response to Company B. **JONES** replied:

> I think it's perfect! I know I shoot from the hip and can get
> defensive at times…but I appreciate your level headedness and
> your gift for words. Thanks for talking me down from the ledge. I

10

    will sleep on this and send the response in the morning. Good
    night!"

  44. On or about June 18, 2020, PERSON A, using a personal email account, sent an email to **JONES**. PERSON A's email forwarded a message that PERSON A had sent to college associates and friends, inviting them to serve as independent contractors for YMJ and provide EAP training services for the Census Bureau's EAP contract:

> Thank you all for your willingness to jump in and spread your expertise with my Census workforce community. In response to the request to provide more insight and information into this endeavor, I am attaching the brief that the vendor [Company B] supplied to me. PLEASE DO NOT SHARE -- for your eyes and awareness ONLY. This presentation gives you guys a glimpse into the work and the services being rendered. I am leveraging one of the vendors YMJ Consulting to support bringing you all in to be trainers as needed. This contract is good for a year, so I hope you all eat multiple times off of this and that I can grow it further. . . . Oh the last thing ---don't act like you know me. I'm trying to be as by the book with this as possible. Please review the attached slide deck and let me know if you have questions.

Included with PERSON A's email was Company B's after-action summary email (dated April 30, 2020) and a draft version of the EAP contract dated April 28, 2020.

  45. On or about June 18, 2020, **JONES** sent an email to PERSON A's college friends and associates with topics for contractors and IRS Form 1099 information.

  46. Between in or about June 18, 2020, and June 19, 2020, **JONES** forwarded information from Company B to PERSON A's personal email account with proposed responses. PERSON A revised or replaced **JONES**'s proposed responses and asked **JONES** to send the new versions to Company B.

  47. On or about June 30, 2020, PERSON A, using a personal email account and copying **JONES**, sent a Zoom meeting invitation to PERSON A's college friends and associates

11

regarding the EAP contract. The email's subject line was "EAP Opportunity Planning Discussion Zoom Meeting Tonight 8pm," and the body of the email stated in part: "I want to thank you each for agreeing to review available options for this EAP opportunity. . . . I will be inviting the subcontractor who has this contract with my agency to this discussion so you all have firsthand insight into this venture."

48. Between in or about late June 2020 and on or about July 2, 2021, **JONES**, PERSON A, using a personal email account, and, at times, PERSON C, using a personal email account, continued to communicate with each other regarding the EAP contract, including PERSON A's proposed responses by **JONES** to emails sent by Company B.

49. On or about July 1, 2020, PERSON C, using a personal email account, sent an email to **JONES** attaching a direct deposit authorization form executed by PERSON C.

50. On or about September 20, 2020, **JONES** sent an email to an account associated with PERSON A's company, COMPANY A, attaching a direct deposit authorization form. **JONES** stated, "Here you go… Let me know your consulting fee(s)." PERSON A replied, "Good evening Yolanda. Thank you for the partnership agreement."

51. On or about November 1, 2020, **JONES**, on behalf of YMJ, and PERSON A purportedly executed a "Mutual Agreement for Services." Pursuant to the terms of the agreement, PERSON A and COMPANY A purportedly agreed to provide a variety of services to YMJ, including "Executive Coaching, Case Management, Content Creation in the Mental Health & Wellness Space, as well as other related services."

52. Between in or about mid-November 2020, and in or about May 2021, PERSON A, using a government email account, sent emails to Census Bureau officials in the Acquisition

Division, initiating efforts to obtain simplified acquisition contracts for Company B and YMJ due to the high "burn rate" on the EAP contract. PERSON A, with staff assistance, also prepared procurement documents and urged the contracting official to expedite the awarding process. PERSON A, using a personal email account and a personal cellular telephone, also sent numerous emails and text messages to Person B, seeking assistance with the EAP contract renewal and Company B to draft several of the procurement documents for PERSON A.

53. On or about December 17, 2020, **JONES** sent an email to PERSON A's personal email account discussing an increase in YMJ's hourly rate for EAP services: "Yep I'm waiting. I agree about the hourly rate for night and evening coverage. I am going up on the training rates by 500 and the labor rates will stay the same for now. I think that's fair." PERSON A, in a reply email, agreed with **JONES**.

54. On or about February 14, 2021, **JONES**, using a personal email account, sent a Zoom meeting invitation to **JONES** and PERSON C. The meeting was titled, "Where the Money Resides," and the password to join the meeting was "FamilyWin." The meeting was part of a series of Zoom meetings involving **JONES**, PERSON A, and, at times, PERSON C, over a multi-year period from in or about mid-2020 until at least in or about late 2022.

55. On or about August 5, 2021, PERSON C, using a personal email account, sent an email to **JONES**'s personal email account, and the personal email accounts for PERSON D and PERSON E. The email attached an Excel spreadsheet called "July Numbers," which PERSON C forwarded from a government email account.

56. In or about August 2021, PERSON A, using a government email account, communicated with the Census Bureau's Acquisition Division about modifying the EAP contract

13

so that the EAP services could be converted from a "time-and-materials" contract to a "firm fixed price contract."

57.     Between on or about July 2, 2021 (after the EAP contract was modified), and on or about June 20, 2023, PERSON A, frequently using a personal email account, continued to: (a) provide and discuss content material for **JONES**, including preparing monthly reports for YMJ so that **JONES** could forward them to Company B for compliance purposes; (b) draft or edit **JONES**'s proposed email responses to Company B; (c) attempt to locate new business opportunities for **JONES** and YMJ; (d) participate in Zoom video conferences with **JONES** and PERSON C; and (e) cause Census Bureau employees to pay outstanding invoices and accelerate payments for Company B and YMJ.

58.     Between in or about August 2020 and in or about July 2023, Company B paid YMJ a total amount of approximately $2,594,400 pursuant to invoices submitted by **JONES** and YMJ.

59.     Between on or about October 20, 2020, and on or about May 1, 2023, YMJ paid PERSON A and COMPANY A a total amount of approximately $790,000, including several payments of between $10,000 and $30,000 through interstate wire transfers. The funds used to make these payments came from the EAP contract funds paid to YMJ pursuant to YMJ's subcontract with Company B.

18 U.S.C. § 371
18 U.S.C. § 201(b)(1)(A) & (B)
18 U.S.C. § 201(b)(2)(A) & (B)
18 U.S.C. § 1343
18 U.S.C. § 1346

## FORFEITURE ALLEGATION

The United States further alleges that:

60. Pursuant to Federal Rule of Criminal Procedure 32.2(a), notice is given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. §§ 981(a)(1)(C), 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c), as a result of the defendant's conviction under any of the offenses in Count One of the Information.

### Conspiracy Forfeiture

61. Upon conviction of the alleged offenses in Count One of the Information, the defendant, **YOLANDA M. JONES**, shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, that constitutes or is derived directly or indirectly, from gross proceeds traceable to the commission of the offenses.

### Substitute Assets

62. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant,

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to 18 U.S.C. § 853(p), as incorporated by 28 U.S.C.

§ 2461(c), to seek forfeiture of any other property of the defendant up to the value of the

forfeitable property.

18 U.S.C. § 853(p)
18 U.S.C. § 981(a)(1)(C)
28 U.S.C. § 2461(c)

Date: 7/21/25

Kelly O. Hayes /MSM
Kelly O. Hayes
United States Attorney
District of Maryland

Edward P. Sullivan
Acting Chief, Public Integrity Section
U.S. Department of Justice